IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHNSON WELDED PRODUCTS, INC.
625 South Edgewood Avenue
Urbana, Ohio 43078

LILLI JOHNSON
625 South Edgewood Avenue
Urbana, Ohio 43078

        Plaintiffs,

    v.

SYLVIA MATHEWS BURWELL, in her
official capacity as Secretary, United States
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201

JACOB LEW, in his official capacity as
Secretary, United States Department of the
Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220

THOMAS E. PEREZ, in his official capacity as
Secretary, United States Department of Labor
200 Constitution Avenue, NW
Washington, D.C. 20210

UNITED STATES DEPARTMENT OF
LABOR
200 Constitution Avenue, NW
Washington, DC 20210

        Defendants.

**COMPLAINT**

Plaintiffs Johnson Welded Products, Inc. ("JWP") and Lilli Johnson (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This is a civil action in which Plaintiffs seek to protect and defend their fundamental rights protected by the United States Constitution and the Religious Freedom Restoration Act ("RFRA").

2.      Pursuant to the Affordable Care Act, Plaintiffs are required to provide an insurance plan that facilitates coverage for contraception, sterilization, abortifacients, and related education and counseling under penalty of federal law (hereinafter "contraceptive services mandate" or "mandate") contrary to Plaintiffs' sincerely held religious beliefs.

3.      Plaintiffs are challenging the alternative regulatory scheme the government incorrectly describes as an "accommodation," which forces Plaintiffs to comply with the contraceptive services mandate in direct violation of their religious beliefs.

4.      Plaintiffs seek a preliminary and permanent injunction enjoining the challenged regulations and a declaration that the mandate and its so-called "accommodation" violate federal constitutional and statutory law.

## JURISDICTION AND VENUE

5.      This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1346.

6.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 28 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this Court.

7.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this district and a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district.

8.      This Court has authority to award Plaintiffs their reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412, 42 U.S.C. § 2000bb-1, 42 U.S.C. § 1988, and the general legal and equitable powers of this Court.

## PARTIES

9.      Plaintiff JWP is a closely-held, family owned and operated business that is located in Urbana, Ohio.   JWP manufactures reservoirs for air brake systems.   It has approximately 420 full-time employees.

10.     JWP is incorporated under the laws of the State of Ohio, and it has elected to be treated as an S-Corporation since 2000.

11.     As part of its corporate philosophy, JWP and its owners "subscribe to the Golden Rule," which they apply in "business as well as [their] personal lives."   The Golden Rule philosophy of JWP is a direct reflection of the Catholic religious beliefs and convictions of its owners, specifically including Plaintiff Johnson.

12.     The Golden Rule carries with it the command from Jesus to love one another as He has loved us.   And Jesus loved us first and foremost by doing the will of the Father. Consequently, the Golden Rule is a mandate to follow God's law, which the contraceptive services mandate and the so-called "accommodation" violate.

13.     As part of its corporate philosophy, JWP and its owners "are continually aware that [their] success depends," in large measure, on their "freedom to exist as a private enterprise." This freedom to exist as a private enterprise includes the freedom to operate JWP consistent with the Catholic religious beliefs and convictions of its owners, including Plaintiff Johnson.

14.     Plaintiff Lilli Johnson is an adult citizen of the United States, and she resides in Ohio.

15.     Plaintiff Lilli Johnson is a Catholic and the mother of seven children, all of whom she raised Catholic. Plaintiff Johnson is the President of JWP, and she controls the voting rights of a majority of the stock of the company. Plaintiff Johnson holds a 10% ownership stake. The remaining 90% ownership stake is shared by Plaintiff Johnson's seven children. There are no other owners of JWP. Consequently, JWP is an "eligible organization" for purposes of the challenged "accommodation." 80 Fed. Reg. 41318, 41326 (July 14, 2015).

16.     As the person controlling a majority of the voting interests of the company and as President of JWP, Plaintiff Johnson establishes and approves the policies governing the conduct of all phases of JWP, and she makes the executive decisions governing the operations of JWP, specifically including decisions regarding the health care coverage provided by the company to its employees.

17.     Plaintiff Johnson has the beneficial interests in the voting rights of a majority of the voting shares of the company. As a result, she controls policy and has resolved that JWP objects to covering all of the contraceptive services required by the contraceptive services mandate on account of the owners' sincerely held religious beliefs.

18.     As the President of JWP, Plaintiff Johnson strives to run her company consistent with her sincerely-held Catholic beliefs.  To that end, Plaintiffs have been careful to craft their insurance plans to exclude coverage for abortifacients, contraceptives, and sterilization. Defendants, however, have made it impossible for them to continue that religious exercise.

19.     Consequently, as a company, JWP objects to covering all of the contraceptive services required by the contraceptive services mandate on account of JWP's owners' sincerely held religious beliefs.

20.     Defendant Sylvia Mathews Burwell is the Secretary of the United States Department of Health and Human Services (hereinafter "HHS").  In this capacity, she has responsibility for the operation and management of HHS, including the enforcement of the challenged regulations.  Defendant Burwell is sued in her official capacity only.

21.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulations which are the subject of this lawsuit.

22.     Defendant Jacob Lew is the Secretary of the United States Department of the Treasury.  In this capacity, he has responsibility for the operation and management of the Department of the Treasury, including the enforcement of the challenged regulations.  Defendant Lew is sued in his official capacity only.

23.     Defendant Department of the Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulations which are the subject of this lawsuit.

24.     Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.  In this capacity, he has responsibility for the operation and management of the

Department of Labor, including the enforcement of the challenged mandate. Defendant Perez is sued in his official capacity only.

25.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulations which are the subject of this lawsuit.

## FACTUAL ALLEGATIONS

### The Affordable Care Act

26.     The Patient Protection and Affordable Care Act (Pub. L. No. 111-148, 124 Stat. 119 (2010)) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. No. 111-152, 124 Stat. 1029 (2010)) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act.

27.     Among many other things, the Affordable Care Act requires employers with more than 50 employees to provide federal government-approved health insurance or pay a substantial per-employee fine ("employer mandate"). 26 U.S.C. § 4980H. JWP is subject to the employer mandate.

### The Affordable Care Act — Not a Neutral Law of General Applicability

28.     To date, HHS has granted over 1,000 individualized waiver requests from employers and to insurance plans excusing their compliance with the Affordable Care Act.

29.     The fine for failure to offer an approved health insurance plan does not apply to employers with fewer than 50 employees, not counting seasonal workers. 26 U.S.C. § 4980H.

30.     Certain provisions of the Affordable Care Act do not apply to members of certain religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (providing that the individual mandate does not apply to members of a "recognized religious sect or division" that

conscientiously objects to acceptance of public or private insurance funds); § 5000A(d)(2)(a)(ii) (providing that the individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).  None of these exemptions apply to Plaintiffs.

31.     The Affordable Care Act's preventive care requirements (described below) do not apply to employers who provide so-called "grandfathered" health care plans.  The Affordable Care Act's default position is that an existing health care plan is not a grandfathered plan.

32.     In November 2013, and in response to the political fallout associated with the cancellation of health insurance for millions of Americans, President Obama announced a "transitional policy" which allows millions of Americans whose insurance companies cancelled their health care coverage as a result of the Affordable Care Act to remain in their non-compliant plans.  Plaintiffs are not eligible for this transitional policy.

33.     The Affordable Care Act is not generally applicable because it does not apply equally to all individuals and employers; because the Act provides for numerous exemptions from its provisions, including exemptions for some religious groups and for some religious beliefs, but not for others; and because HHS grants individualized waiver requests excusing some employers from complying with the provisions of the Act.

34.     The Affordable Care is not neutral because some groups, both secular and religious, enjoy exemptions from certain provisions of the Act, which others do not; because some groups, both secular and religious, have received waivers from complying with the provisions of the Act, while others have not.

35.     Plaintiffs are not eligible for any exemptions from the Affordable Care Act, and they are not eligible for an exemption from complying with the contraceptive services mandate. The federal government's so-called "accommodation" is not an exemption.  In fact, the federal

government's own regulations describe the "accommodation," which now applies to Plaintiffs, as an alternative way to "comply" with the contraceptive services mandate, *see* 78 Fed. Reg. 39,870, 39,879 (July 2, 2013)—the same mandate the U.S. Supreme Court struck down in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), and this Court enjoined as applied against Plaintiffs, *see* Order & Judgment, *Johnson Welded Products, Inc. v. Sebelius*, No. 1:13-cv-00609 (ESH) (D.C. Oct. 24, 2014), ECF No. 11 (granting injunction).

**The Affordable Care Act — Development of the Contraceptive Services Mandate**

36.    The Affordable Care Act mandates that health insurers "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).

37.    Notably, the text of the Affordable Care Act says nothing about contraceptive coverage.  Instead, it requires employers to "provide coverage" for certain "preventive services," including "preventive care" for women.

38.    On July 19, 2010, HHS, along with the Department of Labor and the Department of the Treasury, published interim final regulations "implementing the rules for group health plans and health insurance coverage in the group and individual markets under provisions of the Patient Protection and Affordable Care Act regarding preventive health services."  75 Fed. Reg. 41726 (July 19, 2010).  Among other things, the interim final regulations required health insurers to cover preventive care for women "as provided for in guidelines supported by the Health Resources and Services Administration."  75 Fed. Reg. 41759.

39.    HHS accepted public comments to the 2010 interim final regulations until September 17, 2010.  A large number of groups filed comments, warning of the potential

conscience implications of requiring individuals, corporations, and other organizations to pay for certain kinds of services, including contraception, sterilization, and abortion or abortifacients.

40.     HHS commissioned a study by a private health policy organization, the Institute of Medicine (hereinafter "IOM"), "to review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women."  (*See* http://www.hrsa.gov/womensguidelines).

41.     In conducting its study, IOM invited various pro-elective abortion groups and individuals to make presentations on the preventive care that should be provided by all health insurers.  (*See* http://www.nap.edu/openbook.php?record_id=13181&page=217).

42.     No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.  (*See* http://www.nap.edu/openbook.php?record_id=13181&page=217).

43.     On July 19, 2011, IOM published a report of its study regarding preventive care for women.  Among other things, IOM recommended that preventive services include "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures." (*See Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps* (2011)).

44.     Federal Drug Administration-approved contraceptive methods include, among other drugs, devices and procedures, birth control pills, prescription contraceptive devices, Plan B (also known as the "morning after pill"), and ulipristal (also known as "ella" or the "week after pill").

45.     Plan B and ella can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo.  The use of artificial means to prevent the

implantation of a human embryo in the wall of a uterus or to cause the death of an embryo each constitutes an abortion.  Consequently, Plan B and ella are abortifacients.

46.     On August 1, 2011, HHS's Health Resources and Services Administration (hereinafter "HRSA") announced that it was supporting "the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines."   HRSA titled the recommendations, "Women's Preventive Services: Required Health Plan Coverage Guidelines."  Among other things, HRSA's Guidelines include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."   (*See* http://www.hrsa.gov/womensguidelines).

### The Affordable Care Act — Adoption of the Contraceptive Services Mandate

47.     On August 3, 2011, HHS, along with the Department of Labor and the Department of the Treasury, published interim final regulations which, among other things, mandate that all health insurers "provide benefits for and prohibit the imposition of cost-sharing: . . . . With respect to women, preventive care and screening provided for in comprehensive guidelines supported by HRSA . . . which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines."  76 Fed. Reg. 46621 (Aug. 3, 2011); 45 C.F.R. § 147.130.

48.     Defendant Departments "determined that an additional opportunity for public comment would be impractical and contrary to the public interest" and promulgated the final regulation without waiting for public comment.  76 Fed. Reg. 46624.

49.     The August 3, 2011, interim final regulations noted that "several commenters [to the July 19, 2010 interim final regulations] asserted that requiring group health plans sponsored

by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom."   Accordingly, the Defendant Departments stated that they "seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions. . . . [T]he Departments are amending the interim final rules to provide HRSA additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned."  76 Fed. Reg. 46623 (emphasis added).

50.    Although HHS accepted public comments to the 2011 interim final regulations until September 30, 2011, they went into effect immediately.

51.    As a result, heath insurers were required to begin providing the coverage mandated by HRSA's Women's Preventive Care Guidelines (*i.e.*, the contraceptive services mandate) in the first plan year (in the individual market, policy year) that began on or after August 1, 2012.

52.    Pursuant to the final regulations, the definition of "religious employer" for purposes of the only exemption from the contraceptive services mandate that provides meaningful protection for religious liberty and the right of conscience (*i.e*., it *exempts* the organization from having to comply with the mandate) includes those organizations that fall under Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  78 Fed. Reg. at 39874. These organizations are essentially churches and religious orders—a very narrow class of nonprofit organizations.  Plaintiffs do not qualify for the exemption.

53.    Defendants continue to reject considering a "broader exemption" from the mandate because they believe that such an exemption "would lead to more employees having to pay out of pocket for contraceptive services, thus making it less likely that they would use

contraceptives, which would undermine the benefits [of requiring the coverage].  Employees that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives.  Including these employers within the scope of the exemption would subject their employees to the religious views of the employer, limiting access to contraceptives, thereby inhibiting the use of contraceptive services and the benefits of preventive care."  77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

54.     Thus, the ultimate goal of Defendants is to increase the "use of contraceptive services" and to ensure that employees are not "subject" to the employer's religious beliefs regarding such "contraceptive services."

55.     Defendants have made it clear that they do not intend to provide a "broader exemption" that would in any way "inhibit[] the use of contraceptive services" by employees or subject . . . employees to the religious views of the employer."   In short, Defendants do not intend to extend the exemption from the mandate to corporations such as JWP or their owners, such as Plaintiff Johnson.

56.     Plaintiffs' plan year begins in July.  Consequently, the contraceptive services mandate as enforced beginning in August 2012 would have operated against Plaintiffs as of July 1, 2013.  As a result, Plaintiffs commenced legal action in this Court on April 30, 2013.  *See* Complaint, *Johnson Welded Products, Inc. v. Sebelius*, No. 1:13-cv-00609 (ESH) (D.C. April 30, 2013), ECF No. 1.  A preliminary injunction issued on May 24, 2013.  Minute Order Granting Prelim. Inj., *Johnson Welded Products, Inc. v. Sebelius*, No. 1:13-cv-00609 (ESH) (D.C. May 24, 2013).  And following the U.S. Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the mandate, as applied against Plaintiffs, was permanently

enjoined, *see* Order & Judgment, *Johnson Welded Products, Inc. v. Sebelius*, No. 1:13-cv-00609 (ESH) (D.C. Oct. 24, 2014), ECF No. 11.

### The Affordable Care Act — Adoption of the Alternative Regulatory Scheme for Closely-Held, For-Profit Corporations

57.     In the face of widespread criticism, a multitude of lawsuits, and reversals from the Supreme Court, Defendants have steadfastly refused to expand the "religious employer" exemption beyond its exceedingly narrow definition that currently excludes certain nonprofit religious organizations and closely-held, for-profit companies and their owners, such as Plaintiffs.

58.     Defendants initially offered to non-exempt, nonprofit religious organizations an alternative mechanism to "compl[y] with [the] requirement . . . to provide contraceptive coverage," which ensures that the organization's own plan beneficiaries receive the mandated coverage from the organization's own insurance companies in connection with the organization's own health plans.  26 C.F.R. § 54.9815-2713A(b); 29 C.F.R. § 2590.716-2713A(b)(1); 45 C.F.R. §147.131(c)(1).

59.     Defendants have misleadingly labeled this requirement an "accommodation" because it does not allow the eligible organization to be billed explicitly for the objectionable coverage.  However, this alternative regulatory scheme does not actually "accommodate" the practices of many religious organizations—or Plaintiffs in this case—who object to providing or facilitating the mandated coverage even if they do not have to pay for it.

60.     Defendants' illusory "accommodation" applies to "eligible" organizations that have faith-based objections to offering coverage for "some or all" of the mandated services.  26 C.F.R. § 54.9815-2713A(a).

61.     Following *Hobby Lobby*, the federal government expanded the definition of "eligible organizations" and thus expanded the alternative regulatory scheme (*i.e.,* the "accommodation") by which these organizations must comply with the contraceptive services mandate to include closely-held, for-profit corporations such as JWP and its owners.  80 Fed. Reg. 41326.  Consequently, Plaintiffs must now comply with the contraceptive services mandate *via* the so-called "accommodation."

62.     The final regulations subjecting Plaintiffs to this alternative regulatory scheme (*i.e.*, the "accommodation") apply "beginning on the first day of the first plan year (or, in the individual market, the first policy year) that begins on or after September 14, 2015."  80 Fed. Reg. 41330.  Consequently, Plaintiffs will be required to comply with the contraceptive services mandate via the so-called "accommodation" beginning on July 1, 2016.

63.     This alternative regulatory scheme as it applies to non-exempt, nonprofit religious organizations is currently under review by the U.S. Supreme Court.  *See Zubik v. Burwell*, 136 S. Ct. 444 (2015).

64.     To "compl[y]" with the mandate to provide contraceptive services under this regulatory scheme, an eligible organization, which includes JWP, must first "contract[] with one or more third party administrators" or "provide[] benefits through one or more group health insurance issuers."  26 C.F.R. § 54.9815-2713A(b)(1)(i), (c)(1).  It must then either sign and submit a "self-certification" directly to its insurance company, or sign and submit a "notice" to the federal government providing detailed information regarding its plan name and type, along with "the name and contact information for any of the plan's [TPAs] and health insurance issuers."  26 C.F.R. § 54.9815-2713A(a); (b)(1), (c)(1).

65.     The effect of either submission is the same: By signing and submitting the form, the eligible organization authorizes its insurance company to arrange "payments for contraceptive services" for beneficiaries enrolled in the organization's health plan. 26 C.F.R. § 54.9815-2713A(b)-(c). Thus, "if" and "when" the organization signs and submits the form—but only if and when it does so—its own insurance company becomes authorized and obligated to provide "payments for contraceptive services" to the organization's own plan beneficiaries in connection with the organization's own health plan. 26 C.F.R. § 54.9815-2713A(b)-(c).

66.     To remain in compliance after submitting the form, the organization must then maintain the connection to the insurance company that provides the contraceptive "payments," while continuing to facilitate the coverage by continually updating the company with information about who is covered under the plan.

67.     The contraceptive "payments" are available to the eligible organization's plan beneficiaries only "so long as [they] are enrolled in [the organization's] plan," 26 C.F.R. § 54.9815-2713A(d), and only so long as the organization maintains its "contract" with a TPA or continues to "provide[] benefits through" an insurance issuer, 26 C.F.R. § 54.9815-2713A(b)-(c).

68.     The mandated "payments for contraceptive services" are inextricably tied to the eligible organization's health plan. Defendants have gone to great lengths to explain that these "payments" are not separate "contraceptive coverage policies," so that beneficiaries "do not have to have two separate health insurance policies"—they have a single policy, provided by the eligible organization, which entitles them to receive "payments" for contraceptive services. 78 Fed. Reg. at 39,876.

69.     Plaintiffs' religious commitments motivate them to provide health coverage for the spiritual and physical well-being of their employees. At the same time, Plaintiffs believe that

human life begins at conception, and that certain "preventive" services that interfere with conception or terminate a pregnancy are immoral.

70.     Additionally, Plaintiffs adhere to Catholic teachings regarding "material cooperation," which prohibits facilitating the wrongdoing of others, and "giving scandal," which prohibits tempting others, by words or actions, to engage in immoral conduct.

71.     Plaintiffs have historically exercised their religion by working with insurance companies to make high-quality health coverage available to their employees in a manner consistent with these teachings.  In particular, they have offered health plans through insurers that would not provide or procure coverage for abortion, contraceptives, sterilization, or related education and counseling for their employees.

72.     Defendants' regulatory scheme prohibits Plaintiffs from continuing to offer health coverage in a manner consistent with their Catholic faith.  Plaintiffs sincerely believe that compliance with the mandate—either directly or through one of the "alternative process[es]" offered by Defendants, such as the so-called "accommodation" at issue here—would force them to act in violation of their religious beliefs.  This is true regardless of the type of health plan they offer.

73.     Specifically, Plaintiffs' religious beliefs prohibit them from signing or submitting the required "self-certification" or "notification," which authorizes, obligates, and incentivizes their insurance company to deliver abortifacient and contraceptive coverage to their plan beneficiaries.

74.     Likewise, Plaintiffs' faith precludes them from contracting with or offering health plans through any company that is authorized, obligated, or incentivized to deliver such coverage to their plan beneficiaries in connection with their health plans.

75.     RFRA prohibits the federal government from imposing a "substantial[] burden" on "the exercise of religion" unless doing so "is the least restrictive means of furthering [a] compelling governmental interest."  42 U.S.C. § 2000bb-1.

76.     The federal government imposes a substantial burden on religious exercise whenever it places substantial pressure on a religious adherent to act contrary to his or her sincere religious beliefs.   Here, the challenged regulations substantially burden Plaintiffs' religious exercise by threatening them with ruinous fines and penalties unless they take specific actions to comply with a regulatory mandate to provide abortifacient and contraceptive coverage in violation of their Catholic faith.

77.     In particular, the mandate forces Plaintiffs to submit a document that authorizes, obligates, and incentivizes their own insurance company to deliver the objectionable coverage to Plaintiffs' own employees by virtue of their enrollment in Plaintiffs' own health plans.  It then forces Plaintiffs to act in ongoing violation of their faith by maintaining an objectionable insurance relationship and plan infrastructure through which the coverage is delivered.

78.     Defendants cannot establish that granting a religious exemption for Plaintiffs would undercut any "compelling" interest.   The federal government has already granted numerous other exemptions covering millions of people for reasons such as administrative convenience and political expediency, which are far less "compelling" than the interest in religious liberty that Congress chose to protect under RFRA.

79.     Moreover, Defendants' exemption scheme is entirely irrational because it offers a "religious" exemption to many "religious employers" that have no objection whatsoever to complying with the mandate, while denying an exemption to eligible organizations like Plaintiffs that do object.   After granting all of these other exemptions, Defendants cannot seriously

maintain that granting one more exemption for Plaintiffs would imperil an interest "of the highest order." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 433 (2006) (citation omitted).

80.     If the government's interest is so compelling, then Defendants can use other less-restrictive means to deliver free abortifacient and contraceptive coverage independently of Plaintiffs' health plan.   Given the federal government's extensive powers and vast resources, Defendants cannot seriously contend that forcing Plaintiffs to act in violation of their beliefs is necessary to provide the mandated coverage.   Instead, Defendants could accomplish their goals through minor adjustments to existing programs, such as the insurance exchanges established under the Affordable Care Act, the Title X family planning program, the Medicaid program, or other forms of tax subsidies.   Even if Plaintiffs receive an exemption under RFRA, nothing precludes Defendants from employing one of these alternatives to achieve their goals.

## Plaintiffs' Sincerely Held Religious Beliefs

81.     Plaintiffs have a deep devotion to the Catholic faith.

82.     Plaintiffs hold and actively profess religious beliefs that include traditional Christian teaching on the nature and purpose of human sexuality.   In particular, in accordance with Pope Paul VI's 1968 encyclical *Humanae Vitae*, Plaintiffs believe that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives."   Plaintiffs believe and actively professes the Catholic Church teaching that "[t]o use this divine gift destroying, even if only partially, its meaning and purpose is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to contradict also the plan of God and His Will."   Therefore, Plaintiffs believe and profess that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended

to prevent procreation, whether as an end or as a means"—including contraception and sterilization—is a grave sin.

83.     As Pope Paul VI prophetically proclaimed in *Humanae Vitae*, contraception has opened up a "wide and easy road . . . towards conjugal infidelity and the general lowering of morality."  Consequently, "growing used to the employment of anticonceptive practices," man is "los[ing] respect for the woman and, no longer caring for her physical and psychological equilibrium, [is coming] to the point of considering her as a mere instrument of selfish enjoyment, and no longer as his respected and beloved companion."

84.     Plaintiffs also hold and actively profess religious beliefs that include traditional Christian teaching on the sanctity of life.  They believe and profess that each human being bears the image and likeness of God, and therefore all human life is sacred and precious from the moment of conception.  Consequently, Plaintiffs believe and profess that abortion ends a human life and is a grave sin.

85.     Further, Plaintiffs subscribe to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment.  For example, Plaintiffs believe, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

86.     Based on the teachings of the Catholic Church, and their own sincerely held beliefs, Plaintiffs do not believe that contraception, sterilization, abortifacients, and surgical abortion are properly understood to constitute medicine, health care, or a means of providing for the well-being of persons.  Indeed, Plaintiffs believe these procedures involve gravely immoral practices.

87.     The contraceptive services mandate is, therefore, forcing Plaintiffs to choose between exercising their religion and following their sincerely held religious beliefs or committing a grave sin.  If Plaintiffs choose to follow their religious beliefs and convictions, then they will be subject to severe fines and penalties.

### Plaintiffs' Employee Health Insurance

88.     Plaintiffs employ approximately 420 employees.

89.     As part of their commitment to Catholic social teaching, Plaintiffs promote the health and well-being of their employees.  In furtherance of this commitment, Plaintiffs provide health insurance for their employees.  Providing health insurance that is consistent with Catholic moral teaching is an exercise of religion for Plaintiffs.

90.     Plaintiffs endeavor to ensure that their insurance policies do not cover drugs, devices, services, or procedures inconsistent with their faith, including contraception, sterilization, and abortifacients.

91.     Plaintiffs object to providing health insurance covering artificial contraception, sterilization, or abortifacients, or related education and counseling because doing so violates their sincerely held religious beliefs.

92.     Plaintiffs object to providing information or guidance to their employees about other locations at which they can access artificial contraception, sterilization, or abortifacients, or related education and counseling because doing so violates their sincerely held religious beliefs.

93.     Plaintiffs' health care plan is not a grandfathered plan under the Affordable Care Act for multiple reasons, including, but not limited to, the following: (1) Plaintiffs do not take the position that their health care plan is a grandfathered plan; and (2) the health care plan had an increase in a percentage cost-sharing requirement measured from March 23, 2010.  *See* 42

U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.

94.     Plaintiffs' health care plan is not a grandfathered plan because it has been materially changed since March 23, 2010.  During this time period, for example, there was an increase in out-of-pocket costs (from $6,000 per family and $3,000 per individual to $10,000 per family and $5,000 per individual), a copay was added to its prescription drug coverage, the co-insurance coverage after deductible went from 100% to 90%, and the deductible increased (from $6,000 per family and $3,000 per individual to $7,000 per family and $3,500 per individual), among other changes.

95.     The contraceptive services mandate, including the alternative regulatory scheme for complying with this mandate (*i.e.*, "accommodation"), applies to Plaintiffs as they employ fifty or more full-time employees and are not otherwise exempted from the mandate.

96.     Plaintiffs wish to renew health insurance coverage for their full-time employees on July 1, 2016, while, at the same time, excluding coverage, whether provided directly or indirectly *via* the so-called "accommodation," for all FDA-approved contraceptive methods, including contraceptives, abortifacients, sterilization procedures, and related patient education and counseling, which are required by the mandate.

97.     Under the terms of the contraceptive services mandate and the so-called "accommodation," absent relief from this Court, Plaintiffs will be required to violate their religious beliefs and moral values by facilitating coverage of goods, services, activities, and practices that Plaintiffs consider sinful and immoral.

98.     Failure to comply with the contraceptive services mandate and the alternative regulatory scheme challenged here will subject Plaintiffs to significant fines and penalties.

99.     Failure to provide health insurance that complies with the contraceptive services mandate and the so-called "accommodation" may result in fines and penalties of $100 per day for each employee not properly covered, 26 U.S.C. § 4980D, as well as potential enforcement lawsuits, 26 U.S.C. §§ 1132, 1185d.

100.    Should Plaintiffs, pursuant to their sincerely-held religious beliefs and moral values, not provide health insurance that complies with Defendants' regulatory scheme for their approximately 420 full-time employees, they would be subjected to daily fines and penalties of about $42,000, totaling over $15 million annually.

101.    Non-exempt employers with fifty or more full-time employees that fail to provide any employee health insurance plan are subjected to annual fines and penalties of $2,000 for each full-time employee, not counting thirty of them.   26 U.S.C. § 4980H.   Consequently, dropping healthcare coverage would subject Plaintiffs to fines of approximately $780,000.

102.    The contraceptive services mandate, including the so-called "accommodation," pressures Plaintiffs into choosing between complying with the mandate's requirements in violation of their sincerely held religious beliefs and moral values or paying ruinous fines and penalties that would have a crippling impact on their ability to survive economically. The mandate, including the "accommodation," therefore, imposes a substantial burden on Plaintiffs' religious exercise.

103.    Plaintiffs lack an adequate or available administrative remedy.

104.    Plaintiffs lack an adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### (Violation of the Religious Freedom Restoration Act)

105.    Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

106.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines violates the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, *et. seq.*).

107.    Plaintiffs' sincerely held religious beliefs prohibit them from complying with the contraceptive services mandate *via* the so-called "accommodation."  Plaintiffs' compliance with these beliefs is a religious exercise.

108.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines substantially burdens Plaintiffs' sincerely held religious beliefs.

109.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines does not further any compelling governmental interest.

110.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is not the least restrictive means to accomplish any permissible governmental interest.

111.    The Affordable Care Act's violation of the Religious Freedom Restoration Act has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

112.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

## SECOND CLAIM FOR RELIEF

### (Free Exercise of Religion — Violation of the First Amendment)

113.    Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

114.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines violates Plaintiffs' right to the free exercise of religion guaranteed by the First Amendment to the United States Constitution.

115.    Plaintiffs' sincerely held religious beliefs prohibit them from complying with the contraceptive services mandate *via* the so-called "accommodation." Plaintiffs' compliance with these beliefs is a religious exercise.

116.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called

"accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines substantially burdens Plaintiffs' sincerely held religious beliefs.

117.     The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines chills Plaintiffs' religious exercise.

118.     Plaintiffs must choose between being forced to purchase health insurance for their employees that covers (or facilitates access to *via* the so-called "accommodation") contraception, sterilization, abortifacients, and related education and counseling or paying substantial penalty fines.

119.     The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines creates government-imposed coercive pressure on Plaintiffs to change or violate their sincerely held religious beliefs.

120.     The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines does not further any compelling governmental interest.

121.     The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called

"accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is not the least restrictive means to accomplish any permissible governmental interest.

122.   The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is a restriction on the free exercise of religion that is not narrowly tailored to advance any permissible governmental interest.

123.   The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines does not accommodate Plaintiffs' sincerely-held religious beliefs.

124.   The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is not a neutral law of general applicability.

125.   Notwithstanding its receipt of multiple objections to the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or facilitate access to *via* the so-called "accommodation") contraception, sterilization, abortifacients, and related education and counseling on the basis that it would violate certain persons' sincerely-held religious beliefs, Defendants designed that requirement and its "religious employer" exemption in a way that makes it impossible for Plaintiffs to comply with their religious beliefs.

126.    The Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is official action that targets religious conduct and beliefs for distinctive, discriminatory, and adverse treatment.

127.    Defendants promulgated the Affordable Care Act's requirement that employers such as Plaintiffs provide insurance plans that include coverage for, or facilitate access to *via* the so-called "accommodation," contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines in order to suppress Plaintiffs' and other similarly situated persons' right to free exercise of religion protected by the First Amendment.

128.    The Affordable Care Act's violation of Plaintiffs' right to free exercise of religion as set forth in this Complaint has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

129.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as follows:

A.    That this Court declare that forcing Plaintiffs to comply *via* the alternative regulatory scheme (*i.e.,* "accommodation") with the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or facilitate access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines as set forth in this Complaint violates the Religious Freedom Restoration Act;

B.      That this Court declare that forcing Plaintiffs to comply *via* the alternative regulatory scheme (*i.e.,* "accommodation") with the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or facilitate access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines as set forth in this Complaint violates the First Amendment to the United States Constitution;

C.      That this Court issue an order preliminarily and permanently prohibiting Defendants from enforcing *via* the alternative regulatory scheme (*i.e.*, "accommodation") the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or facilitate access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines against Plaintiff, their group health plans, and the group health insurance coverage provided in connection with such plans;

D.      That this Court award Plaintiffs their reasonable costs, including attorney's fees, pursuant to 28 U.S.C. § 2412, 42 U.S.C. § 2000bb-1, 42 U.S.C. § 1988, and the general legal and equitable powers of this Court;

E.      That this Court grant such other and further relief as it deems equitable and just under the circumstances.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*